| | | |
|---|---|---|
| COLM ROGAN and AMERICAN SECURITY FENCE (IRELAND) LTD., | ) ) ) | |
| Plaintiffs, | ) ) | No. 06 C 0956 |
| v. | ) ) | Magistrate Judge Cole |
| ALLIED TUBE & CONDUIT CORPORATION, a Delaware corporation, and TYCO INTERNATIONAL LTD, a foreign corporation, | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This is a fairly odd case, that's already had a difficult history. It begins with the plaintiff's

complaint – now his amended complaint. He had an agency agreement with a precursor company

to one of the defendants, Allied Tube & Conduit Corporation ("Allied Tube"), which made him the

exclusive agent for a number of territories in Europe, and for Morocco. That agreement may or may

not have survived Allied Tube's acquisition of the precursor company; the plaintiff, Colm Rogan,

says it did. In any event, Allied Tube later consummated a sale of barbed concertina tape in 2002

– the kind of barbed wire the military uses to secure defensive perimeters – to the United States

government's Defense Supply Center in Philadelphia. Mr. Rogan contends that he was involved in

the sale and is entitled to be paid for it under the agency agreement, or *quantum meruit,* or other

theories.

# I.
# BACKGROUND
## A.
## Mr. Rogan's Allegations

Mr. Rogan's complaint presents five causes of action; three are familiar: breach of contract, tortious interference with prospective economic relations, and equitable estoppel. The breach of contract claim is based on the agency agreement. Although the sale was made in the United States and to the United States government, Mr. Rogan contends that the product ended up in Germany, one of his exclusive territories under the agency agreement. He alleges that Allied Tube breached the agreement when it failed to pay him pursuant to that agreement. In his tortious interference count, Mr. Rogan alleges that Allied Tube was going behind his back and attempting to sell its product in his exclusive territories during the term of their agency agreement, from December of 2004, until October of 2005, when it terminated the agreement.

The equitable estoppel count although familiar is not entirely clear. Mr. Rogan says that the barbed tape products that he sold through his company, American Security Fence (Ireland), were the subject of what he understood to be two worldwide patents and that he relied on statements of Allied Tube regarding the patents and assurances that he would be paid for his services. Apparently, it is Mr. Rogan's theory that equitable estoppel comes into play because he relied on Allied Tube's representations about the patents and getting paid. Even if that be true, it is unclear what the patents have to do with anything.

The balance of the complaint is even murkier. The two remaining counts are called "Worldwide Contract" (Count II) and "National Stock Numbers" (Count III). In Count II, Mr. Rogan alleges that, through his efforts, Allied Tube made the government sale and was able to expand its

business beyond Europe and Africa. But, that expansion was just to the United States government, not to other countries. Again, Mr. Rogan focuses on where the United States military might use the barbed wired once it's sold, not on to whom it's sold or where they are. Mr. Rogan claims that Allied Tube offered Mr. Rogan a 5% fee on all non-barbed tape products Mr. Rogan sold, but Mr. Rogan rejected that offer. He contends he deserves 15%, which is the Defense Supply Center's rate for its prime vendors. It's unclear from the allegation what that organization's rate has to do with Allied Tube's payments to it sales people, but Mr. Rogan says he's entitled to it. Moreover, he claims he's entitled to 15% of not just the sales he might have made, but on the total of *all* of Allied Tube's contract invoices from 1989 on. So basically, he says he deserves 15% of Allied Tube's revenue beginning 20 years ago – or 12 years before the government sale at issue. This is an obviously unpersuasive argument.

As for the "National Stock Numbers" count, Mr. Rogan says that Allied Tube could not legally ship products to the Defense Supply Center with the National Stock Numbers, which he obtained. For that, he wants 15% of all of Allied Tube's invoices for contracts using National Stock Numbers he obtained. This count and the "Worldwide Contract" count seem to be – really could only be – *quantum meruit* claims, or at least attempts to provide the bases for such claims.

**B.**
**The Summary Judgment Briefing**

The defendants, Allied Tube and Tyco International Ltd. – which Mr. Rogan merely alleges owns Allied Tube – have filed a motion for summary judgment. Allied Tube contended that it did not become a party to the agency agreement once it purchased the precursor company Mr. Rogan had the agreement with. But even if it did, Allied Tube pointed out that the sale did not involve one of

3

the territories assigned to Mr. Rogan in the agency agreement. Moreover, it contended that Mr. Rogan breached the agency agreement, and that federal law prohibited him receiving a commission on the government sale. Finally, Allied Tube also argued that Mr. Rogan could not establish his entitlement to any money under a *quantum meruit* theory. For its part, Tyco contended that even if Allied Tube were somehow liable, it could not be because it did not control Allied Tube's operations to the extent that would warrant piercing the corporate veil.

Once the defendants filed their motion for summary judgment on February 20, 2009, the proceedings stalled. Mr. Rogan's response was originally due on April 13, 2009 [Dkt. # 46], but he was allowed an extension of time to April 30th. [Dkt. #53]. At the deadline, he asked for and was granted an extension to May 14th. [Dkt. #57]. That gave him a total of nearly three months to file a response. On that day, Mr. Rogan filed his Local Rule 56.1 response, but not his responsive memorandum. There was no explanation and no motion for a further extension. Hearing nothing from Mr. Rogan, the court inquired as to whether he planned to file any memoranda in this case. He did and sought another extension to do so on June 29, 2009. He was given until July 30th to file his responsive memorandum. [Dkt. # 61]. That brought the total time for his filings to over five months encompassing three extensions.[1]

But, July 30th came and went without a filing or motion for additional time. Having no further word from Mr. Rogan, on September 8th the court issued a minute order indicating that it would rule without a responsive memorandum from Mr. Rogan. In response to that order, Mr.

---

[1]Mr. Rogan's lead counsel said he had been seriously ill. But it appeared that another of his three attorneys was responsible for drafting and filing the responsive memorandum, and he explained that the document took 70 hours to complete, and he had been busy with other cases. There was no explanation why this had not been called to anyone's attention at some time during the four-month period that passed from their last contact with the court until their motion to file *instanter*.

4

Rogan's counsel sought leave to file its memorandum *instanter*.

Mr. Rogan's memorandum argues that because Allied Tube did not merely purchase the precursor company, but merged with it. Moreover, Allied Tube assented to the terms of the agency agreement through its subsequent conduct. Mr. Rogan dismissed Allied Tube's arguments about him breaching the agreement and federal law prohibiting a commission and ignored Allied Tube's argument that the sale at issue did not fall under the terms of the agency agreement and its *quantum meruit* argument. Mr. Rogan responded to Tyco's motion by submitting that Allied Tube held itself out as a "Tyco Company" and used a Tyco storage facility for some shipments.

## II.
## SUMMARY JUDGMENT
### A.
### The Federal Rule of Civil Procedure and Applicable Case Law

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden to demonstrate their entitlement to summary judgment, *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). When considering a motion for summary judgment, the nonmoving party's evidence "'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552 (1990)(quoting *Anderson v. Liberty Lobby,* 477 U.S. at 255). Credibility determination must be left for the fact-finder. *Hunt,* 526 U.S. at 552.

But this favor toward the nonmoving party does not extend to drawing "[i]nferences that are supported by only speculation or conjecture." *Fischer v. Avanade, Inc.,* 519 F.3d 393, 401 (7th Cir.2008). The nonmoving party "must do more than raise some metaphysical doubt as to the

material facts; it must come forward with specific facts showing that there is a genuine issue for trial." *Keri v. Bd. of Trs. of Purdue Univ.,* 458 F.3d 620, 628 (7th Cir.2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). Where the nonmoving party bears the burden of proof at trial, it must present specific facts showing a genuine issue to survive summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986); *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir.1996)("If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party."). A genuine issue of material fact exists, precluding summary judgment, "only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Sides v. City of Champaign,* 496 F.3d 820, 826 (7th Cir.2007).

## B.

### Summary Judgment Under the Local Rules

As always, the facts underlying this summary judgment proceeding are drawn from the parties' Local Rule 56.1 submissions. Local Rule 56.1 requires a party seeking summary judgment to include with its motion "a statement of material facts as to which the ... party contends there is no genuine issue and that entitle the ... party to a judgment as a matter of law." Local Rule 56.1(a)(3); *Ciomber v. Cooperative Plus, Inc.,* 527 F.3d 635, 643 (7th Cir. 2008). Each paragraph must refer to the "affidavits, parts of the record, and other supporting materials" that substantiate the asserted facts. Local Rule 56.1(a)(3); *F.T.C. v. Bay Area Business Council, Inc.,* 423 F.3d 627, 633 (7th Cir. 2005) The party opposing summary judgment must then respond to the movant's statement of proposed material facts; that response must be "concise" and contain both "a response to each numbered paragraph in the moving party's statement," Local Rule 56.1(b)(3)(B), and a separate

statement "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment," Local Rule 56.1(b)(3)(C); *Ciomber*, 527 F.3d at 643. Each response and each asserted fact must be supported with a reference to the record. Local Rule 56.1(b)(3)(B); *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009); *Bay Area Business Council, Inc.*, 423 F.3d at 633.

If the moving party fails to comply with the rule, the motion can be denied without further consideration. Local Rule 56.1(a)(3); *Smith v. Lamz*, 321 F.3d 680, 682 n.1 (7th Cir. 2003). If the responding parting fails to comply, its additional facts may be ignored, and the properly supported facts asserted in the moving party's submission are deemed admitted. Local Rule 56.1(b)(3)(C); *Montano v. City of Chicago*, 535 F.3d 558, 569 (7th Cir. 2008); *Cracco*, 559 F.3d at 632; *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006). District courts are "'entitled to expect strict compliance'" with Rule 56.1, and do not abuse their discretion when they opt to disregard facts presented in a manner that does follow the rule's instructions. *Cracco*, 559 F.3d at 632; *Ciomber*, 527 F.3d at 643; *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir.2004).

Mr. Rogan's response runs afoul of the rule in a few instances. His responses to paragraphs 2, 11, 14, and 3, which incorporates his response to paragraph 2, are anything but "concise," each going on for a page or more. This is likely due to the fact that Mr. Rogan did not file a separate statement of additional facts as required by the rule, instead seemingly collapsing his statement into his response. His response to paragraph 8 is essentially non-responsive, to the extent it is a denial, it conflicts with his deposition testimony. Mr. Rogan bases his response to paragraph 9 not on any evidence, but on his own allegations; that makes it either an admission or inadmissible hearsay depending on what is asserted. Portions of his responses to paragraphs 11 and 17 include no citation

7

to evidence. Finally, the entirety of his responses to paragraphs 20, 27, and 28, are unsupported by any reference to evidence. Defendants' statement of facts contains a misstep as well: they provide no support for their assertion in paragraph 2.

### III.
### FACTS

In an agreement dated August 1, 1989, American Security Fence Corporation ("ASFC") appointed Colm Rogan its "sole agent in territory per Schedule A area [Ireland, England and U.K., Spain, Portugal, Italy, Morocco, France, West Germany, Benelux Countries (and) Greece] for the sale of all goods manufactured or dealt with by them for a period of 5 years and thereafter until the appointment shall be terminated by either party after the said period expiring on July 31st 1994 on the 1ˢᵗ day of any month." (*Defendant's Local Rule 56.1 Statement of Material Facts ("Def.St.")*, Ex. B, ¶ 1).[2] Mr. Rogan had to forward to ASFC any proposals for purchases he received, and could "not (without express authority) enter into any contract on behalf of [ASFC] nor bind or attempt to bind them in any way." (*Def.St.*, Ex. B, ¶ 3). ASFC had to send Mr. Rogan any orders it received as a result of his efforts. (*Def.St.*, Ex. B, ¶ 5). ASFC would forward the goods they agreed to sell directly to the customer, along with the invoice; they would also send a copy to Mr. Rogan. (*Def.St.*, Ex. B, ¶ 5).

The agreement went on to provide that Mr. Rogan would:

maintain exclusive right to sell the market [sic] ASFC products within the Territory per Schedule A. [He] agrees not to buy, market or sell or assist others in buying,

---

[2] Defendant refers to American Security Fence Corporation as "American Fence Corporation" and claims, without any support, in a footnote, that no corporation named "American Security Fence Corporation" ever existed. (*Defendant's Local Rule 56.1 Statement of Material Facts ("Def.St.")*, ¶ 2 & n.1). The agreement, however, is on American Security Fence Corporation letterhead, and refers to "American Security Fence Corporation" and "ASFC." (*Def.St.*, Ex. B).

marketing or selling any products from any other company that can be considered of any competitive nature. [Mr. Rogan] shall in essence resell ASFC products to his customers within the Territory. The cost of the products from ASFC to the Agent shall be in accordance with Schedule B. From time to time it may be deemed necessary to raise/lower the prices on Schedule B due to operating and/or material costs increases/decreases. These increases/decreases shall be a point of negotiation and mutual agreement between [ASFC] and [Mr. Rogan].Principal and Agent.

(*Def.St.*, Ex. B, ¶ 5(a)).

Schedule B to the agreement is a list of over 50 products and their prices. The selling price for the goods would be 10% above the price listed in Schedule B. That would be Mr. Rogan's earnings on sales he made. (*Def.St.*, Ex. B, ¶¶ 5(b); 6(a)). And, ASFC would pay Mr. Rogan the expenses he reasonably incurred on their behalf. (*Defendant. St.*, Ex. B, ¶ 7). As Mr. Rogan summarized it, he solicited customers for sales, purchased product from ASFC, and marked up the price to cover his overhead and generate a profit. (*Def.St.*, Ex. C, Rogan Deposition., at 41-42).

In 1997, Allied Tube & Conduit Corporation either purchased or merged with ASFC. Neither parties' evidence explains what actually happened. Allied Tube asserts it purchased ASFC, but cites to Mr. Rogan's complaint for support; but the complaint says it was a merger. (*Def.St.*, ¶ 6, Ex. A, ¶ 9). Mr. Rogan, without support, states that Allied Tube "assumed the ownership and control of the business entity with whom Colm Rogan had a business relationship . . . ." (*Plaintiff's Statement of Material Facts ("Pl.St.")*, ¶ 6).

Similarly, what happened to the company's relationship with Mr. Rogan after that is less than clear. Mr. Rogan testified that they continued to operate under the arrangement that existed; "same programs for the same proprietary products, the pricing structures, the selling structures, the terms, financial terms, were continued." (*Def.St.*, Ex. C, Rogan Deposition., at 47). He said he purchased products and warehoused them, "before he ever found a client." (*Id.*, at 106 ). But, he admitted at

9

his deposition that Allied Tube never paid him commissions. (*Id.*, at 171). Now, he says they did, insofar as a "commission is defined as remuneration for his work on a particular sales contract and as an exclusive sales agent." (*Pl.St.*, ¶ 8).

There were attempts at modifying the existing arrangement, but they were never consummated. (*Def.St.*, Ex. C, Rogan Deposition., at 47). It was not, according to Mr. Rogan, a "buy/sell arrangement" – it remained an agency agreement. (*Id.*). Yet, it certainly sounds like an example of a buy/sell arrangement. *See NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 584 (7th Cir. 1994). The element of exclusivity still seemed in play, at least for several years. Allied Tube general manager Walter Schultz sent Mr. Rogan a letter on October 20, 2005, in which he said Allied Tube "terminated" Mr. Rogan's "exclusive distributor status for Allied Tube & Conduit Corporation Fence Division Products" in Ireland, England and U.K., Spain, Portugal, Italy, Morocco, France, Benelux Countries, Greece, Mali, Niger, Mauritania, Nigeria, Chad, Libya, Turkey, and Tunisia. (*Pl. St.*, Ex. F). Absent from that list was Germany.[3] After that, Mr. Rogan's business was "welcome[d] . . . in a non-exclusive capacity." (*Id.*).

The problem that brought everyone to court arose when Mr. Rogan tried to sell barbed wire fencing – specifically, "barbed tape concertina" ("BTC") – to the Defense Supply Center in Philadelphia, Pennsylvania ("DSCP"). Mr. Rogan was contacted by John Martino of the DSCP on February 3, 2001. (*Def.St.*, ¶ 9, Ex. F, Martino Deposition., at 31, 34-35; *Pl. St.*, ¶9). He was asked to contact Mr. Rogan by a contracting officer regarding an immediate need for BTC in Europe. (*Def.St.*, Ex. F, Martino Deposition., at 35-37). Allied Tube, however, asserts that they had already been speaking with Mr. Martino about supplying BTC for U.S. military installations; Mr.Martino

---

[3] Perhaps this was an oversight; perhaps not. One cannot tell from the parties' submissions.

told Rogan as much in their initial conversation. (*Def.St.*, ¶¶ 13, 15; Rogan Deposition., at 62-63).

Moreover, Allied Tube had provided DSCP with a quote on BTC as early as April 1999 (*Def.St.*, ¶ 14; Ex. G), but apparently, no sale was consummated at that time. On January 23, 2001 – almost two weeks before Mr. Rogan's conversation with Mr. Martino – Allied Tube provided Mr. Martino with a "detailed specification for 36" and 40" long barb concertina barbed tape." (*Def.St.*, ¶ 15; Ex. H).

On March 4, 2002, Jeff Kochanowicz of DSCP sent a fax to Allied Tube stating that "D.S.C.P. plans to issue an RFP [request for bids] shortly for NSN 5660-00921-5516... proposed RFP will be for a Long Term Contract, annual estimated demand approx. 110,000 RL per year, minimum order qty 1200 RL..." (*Def.St.*, ¶ 16; Ex. I). On May 21, 2002, the DSCP posted a Presolicitation Notice for the purchase of "N.S.N 5660-00-921-5516 Barbed Tape, Concertina I/A/W DIC A-A-55522 Annual estimated order quantity is 110,000 RL Solicitation is for an Indefinite Quantity, Indefinite Delivery Type contract, one year base with four potential option years." The notice listed Mr. Kochanowicz as a point of contact, while the "Place of Performance" was listed as "Tracy, California" and "New Cumberland, Pennsylvania." (*Def.St.*, ¶ 17; Exh. J). Of course, much of this type of material – employed in perimeter defense – is eventually shipped all over the world; it is simply shipped to various supply depots stateside – in other words, to "stock the shelves" – and then processed and forwarded to final destinations elsewhere. (Ex. K, at 10, 18-25). That might be places like Germany, Iraq, or Kuwait. (Ex. K, at 9-10, 21-22). As Mr. Kochanowicz testified, when an order is placed, there is no indication where it will ultimately go – it "could be going to a hundred different places." (*Def.St.*, ¶ 22; Ex. K, at 18). Later, when there is a requisition order placed, the requisition code number identifies the end user. (Ex. K, at 12). In any event, the parties agree that

product purchased by the United States government is United States government property, no matter where it ends up being used. (*Def.St.*, ¶ 25; *Pl.St.*, ¶ 25).

Allied Tube submitted its bid proposal on June 24, 2002, with a solicitation number of SP0560-02-R-0303. (*Def.St.*, ¶ 19; Ex. L). Mr. Rogan testified that he was not involved in the submissions made to Mr. Kochanowicz from March 5th to June 24th, and "was not given privy information as to what was submitted for the contract." (*Def.St.*, ¶ 20; Ex. C, at 131). He now disagrees that he wasn't involved, but offers no evidence to support his assertion. (*Pl.St.*, ¶ 20). Mr. Kochanowicz faxed DSCP's approval of Allied Tube's proposal on December 11, 2002. (*Def.St.*, ¶ 21; Ex. M).

Mr. Kochanowicz testified that "the primary driver" for approval of Allied Tube's bid was "production capacity." (*Def.St.*, ¶ 24; Ex. K, at 40). Mr. Rogan agrees, but states that he was involved in formulating production capacity information, which contributed significantly to the award of the contract to Allied Tube. (*Pl.St.*, ¶ 24). He provided Mr. Martino of the DSCP with production capacity information in an email dated May 23, 2001. (*Pl.St.*, ¶ 24; Exs. G, H).

At his deposition, Mr. Rogan was asked to quantify the number of hours he spent on the sale at issue. He answered:

> Doing the work that I believe I performed to get NSN 5516 is quantified in hundreds and thousands of hours experience in Europe, building the necessary expertise and rapport to be on a wavelength with a member of the DSCP, the defense force of the United States who would ring my office.
>
>          \*       \*       \*
>
> And the platform we achieved by having a rapport and a confidence level of what we had transpired in 15 years far outweighs the verbiage I could give you in an answer . . . to say delete the glare [sic] word from the specification; send it to Mr. Martino; engage Bob Major and, hey, presto.
>
>          \*       \*       \*
>
> So my answer is, 15 years getting the experience to have the ability to have a

conversation with a man at that level to make amendments to his specification.

(*Def.St.*, ¶ 29; Ex.C, at 156-157). Essentially, then, Mr. Rogan did not answer the question about the actual work he did on the sale; instead he talked about the years of experience he had prior to the sale. (*Def.St.*, ¶ 29; *Pl.St.*, ¶ 29). He adds that Mr. Martino thought of him as directly linked to Allied Tube and Allied Tube's sales manager said she could talk to him like a partner. (*Pl.St.*, ¶¶ 30, 31). And Allied Tube, at some point, did list him as their "Europe Office Contact" in the sales representative directory on their website. (*Pl.St.*, ¶ 32). Finally, as for Tyco, he states that during the time of the transaction, Allied Tube was its subsidiary. (*Pl.St.*, ¶ 33).

## IV.
## ANALYSIS
### A.
### Even If Allied Tube Was Bound By The Agency Agreement, It Did Not Breach It Because The Sale Was Not To A Customer in Mr. Rogan's Territory

There is a glaring problem with Mr. Rogan's breach of contract claim, and one that Allied Tube points out but Mr. Rogan's submission ignores. Let's say that Allied Tube was bound by the agency agreement Mr. Rogan had with ASFC. It is a relatively brief and simple document. Illinois follows the objective theory of intent, whereby the court looks to the written agreement and not to the parties' subjective understandings. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 714 (7th Cir. 2009).[4] "The status of a document as a contract depends on what the parties express to each other

---

[4] Although the agency agreement includes a clause stating that it will "be construed, in all aspects, in accordance with Irish law," (*Def.St.*, Ex. B, ¶ 12), the parties ignore it and argue as though Illinois law applies. Accordingly, the court will apply Illinois law to the interpretation of the agreement. *Bowers v. Federation Internationale de l'Autombile*, 489 F.3d 316, 323 (7th Cir. 2007); *Yates v. Doctor's Associates, Inc.*, 193 Ill.App.3d 431, 439, 549 N.E.2d 1010, 1016 (5th Dist. 1990)(parties waived application of law chosen in contract provision by basing their arguments on Illinois law).

and to the world, not on what they keep to themselves." *Skycom Corp. v. Telstar Corp.,* 813 F.2d 810, 814-15 (7th Cir.1987). Thus, the contractual language cannot be interpreted in a way contrary to the plain, obvious, and generally accepted meaning of its terms. *Hampton,* 561 F.3d at 714.[5]

The agreement that made Mr. Rogan the exclusive agent for sales "to his customers within the Territory," namely Europe and Morocco, plainly did not include the United States. Yet the sale that Mr. Rogan is complaining about was made to the United States government. That is not a customer in any of the places comprising "his Territory." True, the product might end up in Germany – at a United States military depot – or anywhere around the world where the United States is involved militarily, but that does not make it a sale to a customer of Mr. Rogan's within his assigned territory. Mr. Rogan concedes that the product was sold to the United States government, and remained its property no matter where it went. (*Pl.St.,* ¶ 25). Because the United States was not one of the country's within his "Territory," and because the sale to the United States was not to "one of his customers within the Territory," Allied Tube did not breach the agency agreement.

As already noted, Allied Tube makes this a central point of its motion for summary judgment and Mr. Rogan offers no response. He makes no argument that the United States was one of his

---

[5] Although the cases often use the phrase "a meeting of the minds," as a handy shorthand, the phrase is misleading if taken literally. *See Laserage Technology Corp. v. Laserage Laboratories, Inc.,* 972 F.2d 799, 802 (7th Cir.1992). Since Justice Holmes' classic article, *The Path of the Law,* 10 Harv.L.Rev. 457 (1897), it has been understood that the formation of a contract does not actually require the meeting of the minds of the parties in the sense the terms convey. Today there is common agreement that "no one will understand the true theory of contract or be able to discuss some fundamental questions intelligently until he has understood that all contracts are formal, that the making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs not on the parties having meant the same thing but on their having said the same thing." *Id.* at 464. *See Navair, Inc. v. IFR Americas, Inc.,* 519 F.3d 1131, 1139 (10th Cir.2008)("Put another way, the inquiry will focus not on the question of whether the subjective minds of the parties have met, but on whether their outward expression of assent is sufficient to form a contract.").

14

territories, or that the distribution of product by United States into one of his territories *after* the sale somehow brings that sale under the auspices of the agency agreement retroactively. There was no way to tell where the BTC would ultimately be used. The product was purchased and stored, ready for later requisition and deployment. That deployment might be immediate, but that does not change the fact that the United States government is not within Europe or Morocco.

Mr. Rogan has waived any argument to the contrary by failing to respond. *Local 15, Intern. Broth. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 783 (7th Cir. 2007). Accordingly, Allied Tube is entitled to summary judgment on the breach of contract claim, as is Tyco.

### B.
### Summary Judgment Is Appropriate On
### Mr. Rogan's *Quantum Meruit* Claims In Counts II and III

That leaves Mr. Rogan's claims for "Worldwide Contract", "National Stock Numbers", and "Equitable Estoppel." As already noted, it is difficult to discern just what these counts are attempting to allege. With all deference, evaluating the complaint is what wrestling with a cloud must be like. Allied Tube addresses them all as *quantum meruit* claims, which seems a fair assessment of the "Worldwide Contract" and "National Stock Numbers" claims. On the other hand, Mr. Rogan's complaint seemingly is based entirely on the agency agreement and not merely its existence as part of the historical context in which the claim is asserted. Each claim as Mr. Rogan alleges it, be it the breach of contract or Counts II and III, relies in varying degrees on the agency agreement's terms.

In his response to Allied Tube's motion for summary judgment, Mr. Rogan makes no *quantum meruit* arguments at all, relying entirely on the enforceability of the agency agreement. If,

as Mr. Rogan maintains, the parties' relationship was governed by contract, he may not recover in quasi-contract for events arising out of the same subject matter. *Trade Finance Partners, LLC v. AAR Corp.*, 573 F.3d 401, 414 (7th Cir. 2009); *K. Miller Const. Co., Inc. v. McGinnis*, 913 N.E.2d 1147, 1153 (1st Dist. 2009). So, that could only be a fall-back, alternate theory of recovery if it turned out the parties had no agreement. But, not any longer. Mr. Rogan's failure to respond at all to Allied Tube's *quantum meruit* arguments entitles Allied Tube to summary judgment on any such claims, in whatever guise Mr. Rogan alleges them throughout his complaint. *Keck Garrett & Associates, Inc. v. Nextel Communications, Inc.*, 517 F.3d 476, 487 (7th Cir. 2008).

Moreover, Mr. Rogan was unable to specify just what he did to make the sale at issue that would entitle him to *quantum meruit* recovery. He testified at his deposition – and asserted in his Local Rule 56.1 response – that he had fifteen years of experience in Europe. But salesmen do not got get paid for their entire careers that proceed each sale they make.

The only specific service Mr. Rogan claims to have performed is obtaining "National Stock Numbers" – which he makes in his Count III claim. But that "claim" either fails – if it's a claim at all – or cannot provide support for any recovery under a *quantum meruit* theory. There is no evidence that Mr. Rogan had anything to do with obtaining "National Stock Numbers" for the BTC sale, regardless of the import of such numbers to the consummation of the sale. At his deposition, Mr. Martino testified:

> Q: Can you confirm for me the fact that the number, just the number, that NSN number was in existence and used by the government prior to any communication you ever had in 2001 with Mr. Colm Rogan?
>
> A: Yes. That's correct.
>
> Q: Is it fair to say that Mr. Rogan never obtained NSN number 5660-00-921-5516?

He didn't obtain the number? At best what he did is have input along with others, as you discussed, into the modification of the commercial item description for that number; is that correct?

A: Yes.

(*Def.St.*, ¶ 11; Ex. F, at 79-80). Actually, as Mr. Rogan concedes, it was Mr. Martino, not he, who obtained NSN numbers. (*Pl.St.*, ¶ 11; Ex. F, at 116). He also states, without any evidentiary support, that the government later changed the specifications of the product identified by that NSN. (*Pl.St.*, ¶ 11).[6] In either case, there is no evidence – and no statement in Mr. Rogan's Rule 56.1 response – indicating that Mr. Rogan had anything to do with NSNs or specifications. That completely belies his claim in Count III that he procured NSNs for the sale. This being a summary judgment proceeding, he can no longer simply rest on his allegations. *Celotex Corp.*, 477 U.S. at 323-24; *Paul v. Theda Medical Center, Inc.*, 465 F.3d 790, 793 (7th Cir. 2006). And he cannot rely on evidence that is not referenced in his Local Rule 56.1 submission. *See Bay Area Business Council.*, 423 F.3d at 633. That covers the "National Stock Numbers" and "Worldwide Contract" counts. Summary judgment is appropriate on both, and/or on any *quantum meruit* theory that might be lurking someone in Mr. Rogan's complaint.

---

[6] It is not that Mr. Rogan's statement is insufficient because self-serving. *See Gilles v. Blanchard*, 477 F.3d 466 (7th Cir. 2007). All testimony is self-serving and summary judgment principles do not require that everything asserted by a party be corroborated. Indeed, as Learned Hand made clear, there is no principle of law precluding evidence on the ground that it is self-serving. *United States v. Matot*, 146 F.2d 197, 198 (2d Cir.1944)(L.Hand, J.). *See also Wilson v. McRae's, Inc.*, 413 F.3d 692, 694 (7th Cir.2005); *Dalton v. Battaglia*, 402 F.3d 729, 734-35 (7th Cir.2005); *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003)(summary judgment affidavits not excludable because "self-serving."); *Maher v. City of Chicago*, 406 F.Supp.2d 1006, 1014-15 (N.D.Ill. 2006)(collecting cases). The difficulty is that there is no adequate foundation for this statement, Rule 602, Federal Rules of Evidence, and hence the statement is inadmissible for summary judgment purposes.

## C.
## The Equitable Estoppel And Tortious Interference Claims

Mr. Rogan's equitable estoppel claim – Count V – alleges that Mr. Rogan and his company sold BTC in Europe with the understanding that Allied Tube had worldwide patents on it and anticipated being paid. This understanding came from the claimed detrimental reliance on statements by Allied Tube. Allied Tube makes no arguments for summary judgment on this claim – which is different than a *quantum meruit* claim. To recover under a *quantum meruit* theory, the plaintiff must prove that: (1) he performed a service to benefit the defendant, (2) he did not perform this service gratuitously, (3) defendant accepted this service, and (4) no contract existed to prescribe payment for this service. *K. Miller Const.*, 394 Ill.App.3d 248, 913 N.E.2d 1147 (1st Dist. 2009). On the other hand, the elements of an equitable estoppel claim are that: (1) the other person misrepresented or concealed material facts; (2) the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other person intended or reasonably expected that the party claiming estoppel would act upon the representations; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel would be prejudiced by his or her reliance on the representations if the other person is permitted to deny the truth thereof. *Geddes v. Mill Creek Country Club, Inc.*, 196 Ill.2d 302, 313, 751 N.E.2d 1150, 1157 (2001). Allied Tube's failure to address this claim may be understandable, given the quality of the pleading, but it cannot be granted summary judgment on Count V.

The same is true for Count IV, Mr. Rogan's tortious interference with prospective economic relations claim.[7] Allied advances no argument regarding it, and it is not for the court to do the work of the parties. *See White Eagle Co-opinion Ass'n v. Conner*, 553 F.3d 467, 476 n. 6 (7th Cir. 2009); *Fabriko Acquisition Corporation v. Prokos*, 536 F.3d 605, 609 (7th Cir. 2008). Hence, Count IV remains in play.

### D.
### Tyco Is Entitled To Summary Judgment

The only claims Mr. Rogan brings against Tyco are that it is a foreign corporation doing business in Illinois and that it owns Allied Tube. (*Amended Complaint*, ¶¶ 4-5). The only evidence he submits regarding Tyco is that owns Allied Tube. (*Pl.St.*, ¶ 33). But a parent corporation is not generally liable for the acts of its subsidiary. *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 43 (2007); *United States v. Bestfoods*, 524 U.S. 51, 61 (1998). There are "oodles of cases [standing] for that proposition . . . ." *Bright v. Hill's Pet Nutrition, Inc.*, 510 F.3d 766, 771 (7th Cir. 2007).

The exception to the rule occurs "when (but only when) the corporate veil may be pierced . . . ." *Bestfoods*, 524 U.S. at 63. A corporation's veil of limited liability will be pierced only when there is "such unity of interest and ownership that the separate personalities of the corporation and the individual [or other corporation] no longer exist[,] and when adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Judson Atkinson Candies, Inc. v.*

---

[7] Mr. Rogan's tortious interference claim appears limited to a period of approximately 10 months in 2005. He alleges that Allied acted consistent with the terms of the agency agreement until December 2004. He states that Allied terminated the agreement in October 2005. He then alleges that "[n]otwithstanding the delivery of the termination notice in October 2005 and contrary to the terms of the Agreement, upon information and belief Allied had been contacting companies in Europe offering to sell to them directly rather than utilizing plaintiff's exclusive distributorship." (*Amended Complaint*, ¶¶ 37-40).

*Latini-Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008)(quotations omitted).

The following factors are considered when determining whether there is sufficient "unity of interest" to justify disregarding the corporate form:

> (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere facade for the operation of the dominant stockholders.

*Judson Atkinson Candies*, 529 F.3d at 379. It is the plaintiff's burden to provide evidence sufficient to warrant the piercing of the corporate veil. *Judson Atkinson Candies*, 529 F.3d at 379, 381.

Unfortunately, Mr. Rogan presents absolutely no evidence relevant to any of these factors; he presents no evidence other that the fact that Allied Tube is a wholly-owned subsidiary of Tyco. He adverts to some other evidence in his response brief – evidence that Allied held itself out as a "Tyco Company" on letterhead and such, and that it used a Tyco storage facility in Holland – but he does not reference it in his Local Rule 56.1 statement and so, as already explained, it need not be considered. *See Bay Area Business Council.*, 423 F.3d at 633. But even if Mr. Rogan had properly presented such evidence, the fact that Allied used a Tyco storage facility or referred to itself as a "Tyco Company" on its letterhead does not even approach the showing Mr. Rogan has to make under the applicable law. *See Sumner Realty Co. v. Willcott*, 148 Ill.App.3d 497, 501, 499 N.E.2d 554, 557 (5th Dist. 1986)(even where plaintiff demonstrated that parent and subsidiary had some identical officers, subsidiary rented its office space from parent, *and* used some of the same warehouses as parent, evidence insufficient to pierce the veil); *Zurich American Insurance. Co. v. Watts Industries,*

*Inc.*, 417 F.3d 682, 688 (7th Cir. 2005)(fact that subsidiary is known to be parent's company insufficient to pierce veil). As such, his claim that Tyco is responsible for the acts of Allied Tube fails, and Tyco is entitled to summary judgment on his complaint.

## CONCLUSION

For the foregoing reasons, defendant Allied Tube's motion for summary judgment [# 49] is GRANTED as to the Count I breach of contract claim, the Count II "Worldwide Contract" claim, the Count III "National Stock Numbers" claim, and any *quantum meruit* claim. Defendant Tyco's motion for summary judgment [# 51] is GRANTED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 3/15/10